FILED & JUDGMENT ENTERED
David E. Weich

Dec 31 2009

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | |
|---|---|
| IN RE: | ) |
| | ) |
| BRIAN DAVID STARCHER and | ) Case No. 09-30420 |
| SHANNON MARIE STARCHER, | ) (Chapter 7) |
| | ) |
| Debtors. | ) |
| _____ | ) |
| | ) |
| BRIAN D. STARCHER | ) |
| SHANNON M. STARCHER, | ) Adv. Proc. No. |
| | ) 09-3025 |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| JOANNE MILLS, | ) |
| Defendant. | ) |
| _____ | ) |

**MEMORANDUM OPINION**

**THIS MATTER** was before this Court in a trial on October 6, 2009 for the purpose of determining the dischargeability of a $4,209.57 (plus interest and costs) judgment debt owed by Debtors Brian and Shannon Starcher ("Starchers") to creditor Joanne Mills ("Mills"). The Starchers were

1

represented at trial by counsel Richard M. Mitchell. Mills appeared pro se.

**PRIOR PROCEEDINGS**

The Starchers filed a joint Chapter 7 bankruptcy petition in this Court on February 26, 2009. They then filed this adversary proceeding against Mills on March 4, 2009, seeking a declaration that her prepetition judgment debt against them was dischargeable in this bankruptcy case.

Mills, or more specifically her daughter Joy Mills Widner ("Widner"), is a former customer of a bridal store owned by the Starchers, La Bella Sposa, LLC, which lost a wedding dress in the store's chaotic closing in the Summer of 2008. While Mills maintains the debt should not be discharged, her pro se answer does not delineate any applicable subpart of § 523(a) that might dictate this result. However, from prior proceedings in the action, it appears that Mills' position is founded upon § 523 subsection (a)(4) or (a)(6).

**ISSUES PRESENTED**

1. Was Mill's judgment debt the product of a fraud or misrepresentation by the Starchers within the meaning of 11

2

U.S.C. § 523(a)(2)(A)?

2. Alternatively, was this debt occasioned by a willful and malicious injury to Mills or her property under 11 U.S.C. § 523(a)(6)?

**HOLDING**

If supported by competent evidence, Mills' assertions might well support a declaration of nondischargeability of her debt, at least as against Shannon Starcher. However, Mills has failed to meet her burden of persuasion to establish each element of the aforementioned discharge exceptions by a preponderance of the evidence.[1]

Specifically, the fraud count fails due to a total lack of proof. Almost all elements of a claim of obtaining property by misrepresentation under § 523(a)(2) are also missing.

Mills has demonstrated a technical conversion of her property, but not a willful conversion as required by § 523(a)(6). Mills' debt is therefore discharged and her recorded judgment is rendered void.

---

[1] Paradoxically, while the Starchers are the Plaintiffs in this dischargeability action, it is Mills, the Defendant creditor, who has the burden of proof. *See* Discussion pg. 13, infra; *See* Melichar v. Ost, 7 B.R. 951, 961 (D. Md. 1980)(*citing* In re Pioch, 235 F.2d 903, 905 (3d Cir. 1956)("the burden of proof is on the objecting creditor to prevent the bankrupt's discharge, otherwise stated, the objecting creditor must make out a prima facie case").

3

**FACTS**

*Background*

In 2002, the Starchers opened a "high-end" bridal boutique in Matthews, North Carolina known as La Bella Sposa. Legally, the bridal store was set up as a North Carolina limited liability company. The Starchers are co-owners of the company. Shannon Starcher managed the store. Brian Starcher was otherwise employed. He was not active in the store's day-to-day operations.

Although initially profitable, by the Spring of 2008, La Bella Sposa had fallen on hard times. As the national economy slowed in 2007, the bridal store's sales dropped. As the economy went into recession, customers also became more frugal with brides choosing to spend less on their dresses. Since La Bella Sposa carried high-end dresses, the impact of this new frugality had a disproportionate effect on its business.

In April of 2008, the Starchers met with attorney Richard Mitchell to address their (and the store's) financial difficulties and options. Mitchell considered the store unviable. He recommended that the Starchers immediately close La Bella Sposa.

Unfortunately, his advice was not immediately heeded.

4

Shannon Starcher did not want to let her brides down. She also hoped for a turnaround of the business. Instead of closing, she opted for a storewide markdown sale. The sale did not achieve the desired result. La Bella Sposa limped along for another month, but closed in the latter part of May 2008.

The bridal store's closing caused tremendous angst to its customers, many of whom had upcoming nuptials. Not surprisingly, La Bella Sposa's demise was widely reported in the local television and print media. Matters devolved to the point that the Starchers' home was being staked out by the media. The couple went into hiding in another part of the state.

Customer concerns were raised another notch when the word got out that La Bella Sposa did not have dresses for many of its customers. Some of these accounts went so far as to suggest that the store had been reselling some brides' already worn dresses to other customers as new product.[2]

The first suggestion is plainly true. The store did not have all of the brides' dresses. However, the second assertion was not proven at trial. From the limited

---

[2] Mills was one of the customers quoted in these accounts who made this assertion.

5

evidence presented, it appears that the shortage of dresses stems from store practices in its last months regarding two business activities: (1) new dress sales and (2) cleaning and preserving dresses for brides after their weddings.

La Bella Sposa's principal activity was selling new dresses. La Bella Sposa carried several lines of wedding dresses from a number of manufacturers. At the store, a bride would select her dress based upon floor samples from among these dress lines. She would pay La Bella Sposa a deposit, and the store would order her dress from the manufacturer in the correct size. The store would either pay the manufacturer for the dress with the order or in some instances pay for it before shipment. Final fittings and alterations were made at the store and the bride paid the balance of the purchase price to La Bella Sposa at that point.

Unfortunately, La Bella Sposa did not escrow these customer deposits. Rather, these monies were deposited in its operating account and used in the ordinary course to pay bills. Consequently, as La Bella Sposa struggled to pay its bills during the Spring of 2008, it also fell behind in placing orders for its brides. Unable to pay the manufacturers, some dresses were never ordered; other

6

dresses were never received.[3]

As sales slumped, a different problem developed in the store's cleaning and preservation business. La Bella Sposa did not perform these services in house. Rather, it shipped its customers' dresses to a firm in New York that actually performed the cleaning and preservation services. The bridal store simply charged its customers a fee for providing this service. When the store closed in May 2008, it had possession of a number of bride owned dresses that had not been shipped. One was Widner's dress.

**Joy Mills Widner's Dress**

Joanne Mills ordered a wedding dress, two veils and a custom jacket ("the dress") from La Bella Sposa for her daughter Joy Mills Widner. The dress was received, paid for and worn by Widner in her February 23, 2008 wedding.

Thereafter, in mid March 2008, Widner brought her dress back to the store to have it cleaned and preserved. At the time, Starcher or one of her employees told Widner that the dress would be sent to a firm in New York for this purpose. It should have taken approximately a couple of months to be restored and returned.

---

[3] The record is silent whether the parties' agreement required that these deposits be forwarded to the manufacturer with the order or, alternatively, escrowed for this purpose. This potential defalcation does not affect Mills' because she unlike some other customers received the dress she ordered from La Bella Sposa.

7

La Bella Sposa did not immediately ship the dress to the cleaner in New York. Starcher testified that it was her business practice not to send these dresses individually for preservation. Rather, she would wait until she had accumulated twenty dresses and then ship them as a group. This practice reduced the unit cost of the preservation service, and, according to Starcher, resulted in the dresses being cleaned in a more timely fashion.

Two months later, Widner called the store to check on her dress. The store employee she spoke to assured her that everything was fine. Widner hung up, satisfied that all was well.

Then, the store closed.

**The Mob Scene**

As noted, the store closing left many of La Bella Sposa's customer brides with upcoming nuptials and no dresses. Even after closing her store, Shannon Starcher felt compelled to make amends. Unable to provide the actual dresses her customers ordered, Shannon wanted to offer them a dress from the store's inventory. She decided to accomplish this task in stages. First priority would be given to brides who had weddings quickly approaching; then future brides; and lastly brides who had already been married but had entrusted their dresses to La Bella Sposa

8

for cleaning and preservation.

Starcher contacted the first group of brides and arranged to have them come to the store during the first week of June 2008. Starcher intended to see them one at a time and gave each a specified appointment time. Each would be allowed to select any dress from La Bella Sposa's floor inventory.

Starcher did not involve her counsel in her plan. She should have. However well intentioned, her plan lacked in logistics and foresight.

Given the emotionally charged atmosphere, Starcher was unwilling to face her bride customers; nor could she ask her employees to do the same. Consequently, she asked two former employees to oversee this first set of appointments. Shannon planned to stay in contact with her representatives by phone.

To ensure that things did not get out of hand, Starcher took the precaution of hiring an off duty policeman to provide onsite security. Unfortunately, Starcher instructed the officer to wear plain clothes rather than his uniform. She believed that thus attired, the officer would not cause alarm to the brides and would not alert the media as to what was transpiring.

Fate then intervened. In an unfortunate coincidence, on

9

the morning of the first brides' appointments, La Bella Sposa's unpaid landlord changed the locks on the premises. Starcher's representatives arrived at the store only to find the doors locked. Starcher was called and got on the phone with the landlord. She persuaded him to open up the store, but it was then necessary to locate the employee who had the new key. This took some time.

Meanwhile, the brides with appointments started to queue outside the door. Whether by the forming line or because someone had tipped them, both the media and a number of women without appointments[4] also arrived on the scene. By the time the key was located, instead of one bride no less than fifty or sixty people were milling around outside the door.

One of Starcher's representatives called to tell her about this new development. Starcher authorized the employee to unlock the door and to proceed with the customer appointments, one at a time. This was a disastrous decision. The plainclothes policeman had noted the gathering crowd and had gone around the corner to call for additional help. He was not present when the doors were opened.

---

[4] Apparently, some of these brides were customers without appointments who hoped to find their dresses. However, Starcher says many of those who descended on the store were not customers but simply opportunists hoping to grab something in the confusion.

10

It probably did not matter. When the doors opened, the crowd surged in. Patrons grabbed armfuls of dresses and accessories from the floor and raced out. No regard was paid to ownership of the dresses. Within thirty minutes, the store was ransacked. Most of the store owned inventory was gone; countless dresses were missing; and the remaining inventory was strewn all about the premises.

According to Starcher's uncontroverted statement, in addition to the loss of store-owned inventory, numerous brides with dresses in the store for cleaning lost their property to the crowd. The customer-owned dresses awaiting shipment to New York were kept in a workroom at the back of the store. The crowd entered this room and ransacked these dresses as well. Afterward, many customer owned dresses were also missing.

The spectacle of brides descending upon a wedding dress store was captured by a television crew and generated even more media frenzy.

After the fact, Starcher alerted her attorney to what had transpired. She again attempted to mitigate the harm. With Mitchell's assistance, she sought to "return" to some of the brides those few dresses that remained at La Bella Sposa.

Of relevance, Mitchell's office contacted Widner to

return what Starcher then believed to be Widner's dress. A dress was returned to Widner of the same size, style and color as her original. That dress was even accompanied by a custom bolero like that which Widner owned. However, while of the same product line, this was not Widner's dress.[5] Starcher now believes that Widner's dress was one of the dresses taken by the mob out of the work room.

Mills sued both Starchers in Union County Small Claims Court for the value of her daughter's lost dress. A hearing was held on July 15, 2008. The Starchers did not attend the proceeding, although Mitchell was present. Mills was also present. She told the magistrate what had happened, but does not think she was sworn in to testify.

The state court returned a judgment in favor of Mills and against both Starchers for $4,209.57, plus interest and costs. This is the judgment debt the Starchers hope to discharge in this bankruptcy proceeding.

## DISCUSSION

Mills objects to dischargeability of her judgment debt on the assertion that her daughter's dress (as well as a number of other brides' dresses) was knowingly resold by

---

[5] The dress returned to Widner had a different bustle and lacked other custom alterations found in Widner's dress. Also, according to Mills and Widner, the returned dress to her was 'worn.'

12

the Starcher's to other brides before La Bella Sposa closed in May 2008.

The Court is sympathetic to Mills and Widner's plight. The loss of an irreplaceable family heirloom is not just a financial setback but also a personal tragedy. Even so, this adversary proceeding must be decided on legal principles and evidence, not on sympathy.

The primary purpose of the Bankruptcy Code is to relieve debtors from oppressive debt and to provide them with a "fresh start." In re Cohn, 54 F.3d 1108(3d Cir. 1995). Consistent with this policy, in order to exclude a particular debt from discharge, the creditor must demonstrate by a preponderance of the evidence, each element of the applicable § 523(a) subsection. Collier, ¶ 523.08[2] (*citing* Garner v. Grogan, 498 U.S. 279 (1991)).

As a preliminary matter, no evidence was presented that in any way linked Brian Starcher with the loss of Widner's dress or to Mill's claims. Brian Starcher was a co-owner of the store, but this fact does not make him personally liable for its debts, given that La Bella Sposa was an incorporated business. *See* Staton Holdings, Inc., v. Mileski (In re Mileski), 416 B.R. 210, 225 (Bankr. W.D.N.C. 2009)(*citing* Garner v. Furmanite Australia Pty., Ltd., 966 S.W.2d 798, 803 (Tex. App. 1998)(stating, "The 'fiduciary

13

shield' doctrine protects an employee of a company from personal jurisdiction when the employee's actions have been on behalf of his employer").

Nor can Brian Starcher be held personally responsible for intentional torts, such as fraud or conversion, in which he was not a participant and of which, on this record, he was not even aware. Consequently, Brian Starcher's trial motion for directed verdict is **GRANTED**.

The case against Shannon Starcher is a bit stronger, but ultimately lacks necessary facts to make the case for nondischargeability.

### I. Fraud and Misrepresentation under § 523(a)(2)(A)

Under subsection (a)(2)(A) of § 523, an individual is not discharged from any debt for money, property, or services to the extent obtained by false pretenses, a false representation or actual fraud. 11 U.S.C. § 523(a) (2007).

The elements of fraud are: 1) a false representation or concealment of a material fact, 2) that is reasonably calculated to deceive, 3) made with an intent to deceive, 4) which does in fact deceive, and 5) resulting in damage to the injured party. Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 134 (4th Cir. 1999).

Few, if any, of the requisite elements of fraud or

14

misrepresentation are present.

Factually, there is simply no competent evidence to support Mill's fraud theory, that La Bella Sposa took possession of Widner's dress intending to resell it to another customer.

Mills theory rests on her suspicions and on media accounts accusing La Bella Sposa of reselling customer dresses. Of the latter, several accounts are themselves founded on statements by Mills' or other store customers. These hearsay accounts are not competent evidence.

Lacking such evidence, if Mills debt is to be deemed nondischargeable under § 523(a)(2), it must be because of some misrepresentation made to her by Shannon Starcher at the time she entrusted the dress to La Bella Sposa for cleaning.

Starcher's only representation to Widner was that her dress was being sent to New York to be cleaned and preserved and would be returned in a couple of months. Since the preservation process itself took about sixty days, the statement was true provided that the store intended to immediately ship it.

Starcher knew but did not tell Widner that the store did not always immediately ship the dress to the cleaner. Rather, the store made a practice of holding the dresses

15

until a total of twenty dresses were collected in order to get a better price. What we don't know is whether a shipment was in the offing when this conversation took place. If not, then this was a misrepresentation by omission of a salient fact.[6]

For the same reasons that we cannot find a misrepresentation, we cannot find intent to deceive. We have no evidence as to how many dresses were on hand for shipment when that statement was made; we don't know whether Starcher knew that the store did not have enough to send, or that it would still not have an outgoing shipment for a period of months. This may have been an intentionally misleading statement or it may have been one made a good faith that proved erroneous. One cannot tell.

Finally, the § 523(a)(2)(A) argument fails because Starcher did not obtain property from Widner based upon this statement, within the meaning of the statute. Section 523 (a)(2)(A) makes a debt nondischargeable only "for money, property or services…, to the extent **obtained**, by…"

---

[6] A certain misrepresentation was made to Widner when she called the store in May: that everything was on track. It was not. Actually, the store was in financial trouble; the Starchers had already met with bankruptcy counsel; and most significantly, the dress had not been shipped to the cleaner. Now two months after it was entrusted to the store, according to Starcher it was still hanging in the back of La Bella Sposa. The problem with this misrepresentation is that the evidence did not show that the conversation Widner had was with Starcher as opposed to another employee, or that Starcher instructed staff to mislead Widner. Without this, the statement is not usable in our action.

16

fraud. 11 U.S.C § 523 (a)(2).

The Supreme Court has determined that the phrase "to the extent obtained by" modifies money, property or services. Cohen v. De La Cruz, 523 U.S. 213, 213 (1998). The phrase clarifies that the money, property or services obtained by the fraud is the crux of making the debt nondischargeable. Id at 213-214. "Once it is established that specific money or property has been obtained by fraud, however, "any debt" arising there from is excepted from discharge." Id at 218.

In this case, the only property obtained by La Bella Sposa from Mills/Widner was the dress entrusted to the store for care. There is no evidence in the record that any money was paid to La Bella Sposa at the time.

### *II. Willful and Malicious under §523(a)(6): wrongful conversion*

The second theory under which the debt owed to Mills could be nondischargeable is if Mills proved that the dress was wrongfully converted as a willful and malicious injury.

Under 11 U.S.C § 523 (a)(6) the debt will not be discharged for willful and malicious injury by the debtor to the property of another entity. 11 U.S.C § 523 (a)(6). A "willful and malicious" act of a debtor is undertaken with the intent to cause the injury. Kawwaauhau v. Geiger,

17

523 U.S. 57, 57(1998). The act is done "intentionally and deliberately in knowing disregard of the rights of another." In re Mileski, 416 B.R. 210 (Bankr. W.D.N.C. 2009) (*citing* In re Kim, 2008 WL 2705082, at *3 (Bankr.E.D.Va. 2008)).

Wrongful conversion is within the scope of a "willful and malicious" act under § 523 (a)(6). Stanley v. Stanley, 66 F.3d 664, 668 (4th Cir. 1995). A wrongful conversion is done intentionally and without justification or the owner's consent. Lampi v. Hundman Lumber Mar Co., Inc., 152 B.R. 543, 545 (C.D. Ill. 1993). The core of conversion is not that the wrongdoer acquired property or any benefit from the act, but that the owner was wrongfully deprived of his property. In re Walker, 416 B.R. 449, 468 (Bankr. W.D.N.C. 2009) (*citing* Lake Mary Ltd. P'ship v. Johnston, 145 N.C. App 525, 551 (2001)).

However, the Supreme Court has decided a claim or judgment based upon negligence is not a willful and malicious injury within the exception, even if the negligence is reckless or wanton." Kawaauhau, 523 U.S. at 64. Therefore, if the Debtor commits a technical conversion or even a negligent conversion, the debt resulting from such conversion is dischargeable in bankruptcy. Id; In re Behr, 42 B.R. 922, 925 (E.D. Bankr. 1984) (*citing* Davis v.

18

Aetna Acceptance Corp., 293 U.S. 328 (1934)).

To determine whether Starcher had the requisite intent of knowingly disregarding Mills' rights the Court applies the St. Paul test. Stanley, 66 F.3d at 667 (*citing* St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1009 (4th Cir. 1985)). This test proscribes that it is the debtor's subjective state of mind that is pertinent; it is irrelevant that a reasonable debtor would have known that his actions would adversely affect the rights of another. Id.

Had it been shown that Starcher resold Widner's dress to another bride, then the defendant would have been guilty of an intentional conversion and this debt would be nondischargeable. On this record, however, the only competent evidence suggests that the dress was still in the store in May and that it was lost in the scrum. In short, the dress was given to La Bella Sposa and never returned to Widner. As such, Mills has proven only a technical, and not an intentional, conversion of her daughter's wedding dress.

At most Starcher is guilty of negligence. She did authorize opening the doors. She intended to allow one customer in; instead, she got a mob. The evidence suggested that Widner's dress was in the back of the store behind closed doors. This location in the store demonstrates that

19

Starcher's intent was no more than negligence and not a knowing disregard of the rights of others. If Mills had proven that Starcher left Widner's dress in the front of the store where the brides were going to be permitted to choose replacement dresses, this may have met the knowing disregard standard. In sum, the evidence on record may have proven negligence at most, and a negligent conversion is dischargeable. The evidence did not prove that Starcher subjectively knowingly disregarded Widner's rights in the wedding dress. Thus, the conversion was not a wrongful conversion and does not satisfy 11 U.S.C § 523 (a)(6) for nondischargability.

Again, the Court is sympathetic to Joanne Mills and her daughter, Joy Mills Widner. It is possible that her dress was sold to another bride, however, the Court must rule on the evidence presented and the burden was not met as to either fraud or wrongful conversion under 11 U.S.C § 523 (a). The $4,209 judgment debt by the Starchers to Joanne Mills is discharged and the judgment dated July 15, 2008 (Union County Clerk of Court, J001, File #08-CVM-1103) is now void.

**SO ORDERED.**

**This Order has been signed electronically. The judge's signature and court's seal appear at the top of the Order.**     **United States Bankruptcy Court**